## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————————
|  |  |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Case No. 1:09-cv-01151 (EGS) |
| v. | ) |
|  | ) |
|  | ) |
| DEPARTMENT OF JUSTICE, | ) |
|  | ) |
| Defendant. | ) |
—————————————————————————

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff in this Freedom of Information Act ("FOIA") case seeks access to the FBI's

Domestic Investigations and Operations Guide ("DIOG"), which constitutes the FBI's

investigation "playbook," governing how it conducts substantially all of its domestic

investigations—from prosecuting street level drug dealers to combating terrorism and conducting

sophisticated counterintelligence operations.  The FBI, outside of the context of this lawsuit, has

already voluntarily produced more than half of the three-hundred-plus pages of this document in

full.  The FBI has produced almost all of the rest of the pages with redactions.   Plaintiff,

however, seeks to require the FBI to publicly disclose sensitive law enforcement information

contained within the DIOG regarding various investigative techniques, methods and procedures,

including details about what specific techniques are used by the FBI, the the circumstances under

which such techniques are employed, and the internal restrictions that are imposed on those

techniques. The release of this information would significantly undermine the FBI's efforts to

enforce the law and protect the United States from domestic and foreign threats.  As

demonstrated below, the FBI has properly withheld this information under applicable FOIA exemptions, and therefore asks the Court to enter summary judgment on its behalf.

<u>BACKGROUND</u>

On September 29, 2008, Attorney General Mukasey signed the Attorney General's Guidelines for Domestic FBI Operations.  *See* Transmittal Declaration of Bryan R. Diederich ("Diederich Decl.") Ex. A (The Attorney General's Guidelines for Domestic FBI Operations).  In the accompanying memorandum, Attorney General Mukasey explained that the Domestic Guidelines were intended to "make the FBI's operations in the United States more effective by providing simpler, clearer, and more uniform standards and procedures."  Diederich Decl. Ex. B (Mem. from Attorney General to Heads of Dept. Components).  The memorandum directed the FBI to implement the provisions of the Attorney General's Guidelines by December 1, 2008. *See id.* at 4 & 6.

In order to fulfill the Attorney General's directive, the FBI formulated a document called the Domestic Investigations and Operations Guide ("DIOG"), "a comprehensive 270-page collection of procedures, standards, approval levels, and explanations" intended to protect Americans' civil rights and liberties while enhancing the FBI's capabilities as an intelligence agency.  *See* Diederich Decl. Ex. C (Letter from Valerie Caproni to John D. Rockefeller, Dec. 15, 2008) at 1.  A broad document, the DIOG contains information ranging from general principals to chapters detailing the FBI's procedures for conducting clandestine operations.  *See* Declaration of David M Hardy ("Hardy Decl.") Ex. D; Declaration of John S. Pistole ("Pistole Decl.) ¶ 10.

The FBI has long sought to balance the interest in sharing the content of the DIOG with the public against the FBI's need to maintain operational effectiveness.  Shortly before the DIOG

went into effect, the FBI conducted a series of briefings with interested parties.  On November 18, 2008, the FBI briefed staffers from the Senate Intelligence and Judiciary Committees.  *See* Pistole Decl. ¶ 3; Diederich Decl. Ex. C at 7; S. Rep. No. 111-6 (2009).[1]  At these meetings chapters 4, 5, 10 and 16 of the DIOG were shared on a read-and-return basis.  *See id.*

On November 19, 2008, FBI General Counsel Valerie Caproni hosted a briefing for several civil rights groups, including Muslim Advocates.  *See* Pistole Decl. ¶¶ 3-4; Diederich Decl. Ex. C at 7.  On November 25, 2008, Ms. Caproni hosted a briefing for civil liberties groups, including Electronic Frontier Foundation ("EFF").  At both of these meetings, Ms. Caproni and Mr. Larson made a presentation describing various aspects of the DIOG.  *See id.*  In addition copies of DIOG chapters 4, 5, 10 and 16 were handed out.  *See id.* ¶ 4.  At the end of these meetings, each of which lasted approximately one and one-half hours, the portions of the DIOG that had been handed out were collected.  *See id.* ¶ 4.

Consistent with FOIA's purposes, the FBI determined to publicly release as much of the DIOG as it could.  On December 15, 2008, Valerie Caproni explained to Senator Rockefeller that the FBI was "in the process of reviewing the DIOG to determine what portions can be publicly released without unduly exposing sensitive investigative techniques and methods."  Diederich Decl. Ex. C at 7.

At this same time, Electronic Frontier Foundation submitted a FOIA request seeking the FBI's "Domestic Investigative Operational Guidelines ("DIOG")."[2]  Hardy Decl. ¶ 5.  On December 16, 2008, the FBI acknowledged EFF's request.  Hardy Decl. ¶ 6.  On May 29, 2009,

---

[1] For the Court's convenience, this document is attached as Exhibit D to the Diederich Declaration.
[2] The document at issue in this case is called the Domestic Investigation and Operations Guide.  Though the EFF request does not correctly name the document, the Defendant assumes that this is the document EFF requested.

the FBI wrote to the EFF, explaining that the FBI intended to make a public release of portions

of the DIOG.  Hardy Decl. ¶ 7.

Before the FBI finished the process of vetting a public-release version of the DIOG, both

EFF (June 24, 2009) and Muslim Advocates (September 16, 2009) filed suit, seeking release of

the DIOG under the FOIA.  During the pendency of the suits, the FBI continued with the process

of preparing a public-release version of the DIOG.  In late September 2009, the FBI posted on its

website a copy of the DIOG with certain material redacted.  *See* Hardy Decl. ¶ 9.  On October

13, 2009, the FBI provided both EFF and Muslim Advocates with a copy of the DIOG

containing fewer redactions than the DIOG posted in late September.  *See id*.  In connection with

the instant briefing, the FBI provides an additional copy of the DIOG.  In this version, the FBI

has exercised its discretion to make additional releases of the material redacted in the prior-

released versions of the DIOG.  *See* Hardy Decl. ¶ 9.

<u>ARGUMENT</u>

## I.      STATUTORY BACKGROUND AND STANDARD OF REVIEW

The FBI is entitled to summary judgment because it has released as much information to

plaintiff as it reasonably can, redacting only information exempt from disclosure by the FOIA.

The FOIA, 5 U.S.C. § 552, "represents a balance struck by Congress between the public's right

to know and the government's legitimate interest in keeping certain information confidential."

*Center for Nat'l Sec. Studies v. Dept. of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003).  While the

FOIA requires agency disclosure under certain circumstances, the statute recognizes "that public

disclosure is not always in the public interest." *Baldridge v. Shapiro*, 455 U.S. 345, 352 (1982).

Thus, the FOIA exempts nine categories of information from the general disclosure obligation.

*See* 5 U.S.C. §§ 552(a)(3), (b)(1)-(b)(9).

To sustain its burden of justifying nondisclosure of information, *see* 5 U.S.C. § 552(a)(4)(B), an agency may submit a declaration or index describing the withheld material with reasonable specificity, explaining the reasons for non-disclosure, and demonstrating with reasonable specificity that reasonably segregable material has been released.  *See Johnson v. Exec. Office of U.S. Attorneys*, 310 F.3d 771, 774, 774 (D.C. Cir. 2002).  A court reviews an agency's response to a FOIA request *de novo*, *see* 5 U.S.C. § 552(a)(4)(B), but given the unique nature of FOIA cases, an agency declaration is accorded a presumption of good faith.  *See Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *see also Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1991) (noting that in (b)(1) context, declaration is accorded "substantial weight").  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007); *see also Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  An agency should prevail if the declaration submitted is clear, specific, reasonably detailed, and describes the withheld information in a factual and nonconclusory manner.  *See Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984).  The FBI's showing in this case, which includes two detailed affidavits and a redaction-by-redaction index of the withheld material, demonstrates the propriety of the redactions and its entitlement to summary judgment.

## II.    DEFENDANT HAS PROPERLY WITHHELD RECORDS UNDER THE APPLICABLE FOIA EXEMPTIONS

### A.    The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA Exception (b)(7)(E).

Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes" where release of such information "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigation or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  This exemption is comprised of two clauses:  the first relates to law enforcement "techniques or procedures," and the second relates to "guidelines for law enforcement investigations or prosecutions."  *Id.*  The latter category of information may be withheld only if "disclosure could reasonably be expected to risk circumvention of the law."  *Id.*  No such showing of harm is required for the withholding of law enforcement "techniques or procedures," however, which receive categorical protection from disclosure.  *See Keys v. Dep't of Homeland Sec.*, 510 F. Supp. 2d 121, 129 (D.D.C. 2007) (citing *Peter S. Herrick's Customs & Int'l Trade Newsletter v. Customs & Border Prot.*, No. 1:04-cv-00377, 2006 WL 1826185, at *7 (D.D.C. June 30, 2006)); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004); *Smith v. Bureau of Alcohol, Tobacco & Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997) (citing *Fisher v. U.S. Dep't of Justice*, 772 F.Supp. 7, 12 n.9 (D.D.C. 1991), *aff'd*, 968 F.2d 92 (D.C. Cir. 1992)).[3]

---

[3] *PHE, Inc. v. Dep't of Justice*, 983 F. 2d 248 (D.C. Cir. 1993), is not to the contrary.  In *PHE*, the circuit court stated that a defendant "under both the (b)(2) and (b)(7)(E) exemptions must establish that releasing the withheld materials would risk circumvention of the law."  983 F.2d at 250.  It is not clear, however, that the *PHE* court considered the clauses of exemption (7)(E) separately.  In *PHE*, the court considered a request for a portion of the FBI's *Manual of Investigative Operations and Guidelines* ("MIOG") and the National Obscenity Enforcement Unit's ("NOEU") *Obscenity Prosecution Manual*.  *Id.* at 249.  The FBI withheld portions of the MIOG under both exception (b)(2) and (b)(7)(E).  *Id.*  The FBI demonstrated to the court's satisfaction that releasing the redacted portions of the MIOG could lead to circumvention of the law, meaning that it had satisfied its burden under both (b)(2) and (b)(7)(E).  *See id.*  Accordingly, with respect to the MIOG, the court did not need to reach the question whether the document was also properly withheld under the first clause of (b)(7)(E).

     With respect to the NOEU manual, the court found that NOEU had "provided almost no reason" for its withholding.  *Id.* at 248.  While the court acknowledged that NOEU could justify the withholding if it had shown a valid circumvention risk, it did not say that NOEU needed to make a circumvention showing in order support withholding under the first clause of (b)(7)(E).  *See id.* at 252.  In the briefing before the court in *PHE*, counsel for the party seeking disclosure argued two alternative positions – that there was no categorical protection for techniques and procedures and that the NOEU manual did not actually contain techniques and procedures.  *See* Appellant's Br., No. 91-504 at 9-10, 1992 WL 12599902 (D.C. Cir. Sept. 14, 1992).  It is not evident from the court's decision which of these two positions it accepted.

     Tellingly, even after *PHE*, other judges of this court have recognized categorical protection for law enforcement techniques and procedures.  *See Keys*, 510 F. Supp. 2d at 129 (D.D.C. 2007); *Judicial Watch*, 337 F.

It is evident from the face of the DIOG that it was compiled for law enforcement purposes. The FBI, "[a]s the primary investigative agency of the federal government, . . . has the authority and responsibility to investigate all violations of federal law that are not exclusively assigned to another federal agency." Hardy Decl. Ex. D at DIOG-11. The DIOG is intended to "standardized policy so that criminal, national security, and foreign intelligence investigative activities are accomplished in a consistent manner." *See id.* Consequently, the Court need only decide whether portions of the DIOG were properly withheld under either clause of Exemption 7(E).

1.     The FBI Properly Withheld Portions of the DIOG as Revealing
       Information that Could Reasonably Be Expected to Potentially Increase
       the Risk of Circumvention of the Law.

The second clause of Exemption 7(E) "shields information if 'disclosure could reasonably be expected to risk circumvention of the law.'" *Mayer Brown LLP*, 562 F.3d at 1192-93. As the circuit court has recently made clear, because of the government's interest in deterring crime, "the exemption is written in broad and general terms." *Id.* at 1193. In order to properly withhold documents under this provision, the government need not show that circumvention of the law as the result of the disclosure is certain or even likely. *Id.* at 1193. Rather, information is exempt if disclosure "could *increase the risks* that a law will be violated or that past violators will escape legal consequences." *Id.* at 1193. Even the risk that such information will "embolden" a person to attempt to break the law is sufficient to justify withholding. *See Mayer Brown*, 562 F.3d at 1194. No "highly specific burden of showing how

Supp. 2d at 181 (D.D.C. 2004); *Smith*, 977 F. Supp. at 501 (D.D.C.1997). Moreover, shortly before the *PHE* decision, a panel of the circuit court including two of the judges that would eventually decide *PHE*, summarily affirmed "for substantially the same reasons stated by the district court" a district court decision noting that non-investigatory law enforcement records "reflecting techniques or procedures are now entitled to categorical protection under Exemption 7." *Fisher v. U.S. Dep't of Justice*, 772 F.Supp. 7, 12 n.9 (D.D.C. 1991), *aff'd*, 968 F.2d 92, 1992 WL 154047 (D.C. Cir. 1992).

the law will be circumvented" is placed upon the government; it is sufficient for the government to "'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'" *Id.* at 1194 (quoting *PHE*, 983 F.2d at 251).

Under this standard, it is clear that the FBI's withholding of details of certain investigative techniques and procedures is permissible. Here, while the FBI was able to share much of the DIOG, specific categories of information in the DIOG had to be redacted in order to protect the FBI's operational effectiveness. The DIOG is, in effect, the FBI's playbook; revealing more than the FBI has already revealed would be tantamount to giving the law enforcement playbook to the opposition. *See* Pistole Decl. ¶ 12; *see PHE*, 983 F.2d at 251; *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1053 (D.C. Cir. 1981) (en banc). Because of the risk associated with such a sweeping revelation of FBI techniques and procedures, each of the categories of information was properly withheld under Exemption 7(E).

> a.    The FBI Properly Withheld Information About its Operational Directives.

The DIOG contains rules and procedures affecting "virtually all of the FBI's investigative activities and techniques." Pistole Decl. ¶ 10. This includes what the FBI terms "Operational Directives"—the policies, procedures and standards for conducting investigations. *See id.* ¶¶ 12, 32. A review of even the DIOG's table of contents reveals the scope of the DIOG's role in the FBI's investigations and law enforcement activities. The DIOG describes in detail the types of investigation that the FBI may undertake and when they can undertake them. *See* Hardy Decl. Ex. D at DIOG-3-8 (identifying Assessments, Preliminary Investigations, Full Investigations, and Enterprise Investigations). It also contains instructions for conducting Foreign Intelligence and Sensitive Investigations and describes more than a dozen investigative methods. *See id.* at

DIOG-5-7.  While the FBI has endeavored to release as much detail as possible about these

activities, *see* Hardy Decl. ¶ 9, some details necessarily had to be redacted.

Information redacted under this category describes step-by-step what agents are to do in

conducting an investigation, ranging from instructions about what information to gather in an

investigation to instructions about where specifically to file investigatory information (*i.e.*,

identifying the specific databases and/or offices in which such information will be stored).  In

addition, Operational Directives encompass what investigative techniques are authorized and the

FBI's policies with respect to when such activities may be undertaken.  *See* Pistole Decl. ¶ 12,

32.[4]  The DIOG gathers much of the FBI's law enforcement techniques and strategies in one

place.  *See id.*; *see also* Hardy Decl. Ex. D. at DIOG-12.  Providing potential criminal elements

with such a comprehensive "roadmap" of the FBI's procedures necessarily carries with it the risk

that they will develop comprehensive counter-strategies and circumvention techniques.  *See*

Pistole Decl. ¶¶ 12, 32.  While revealing information about any one specific technique,

procedure or policy may not be fatal to the FBI's effectiveness, revealing the entirety of a

document containing substantially all of that information will significantly hamper its

effectiveness.  *See id*.  ¶¶ 10-12, 32.  The Courts have recognized that releasing bits of

information about an agency's practices can create a "mosaic" that reveals secret techniques and

procedures.  *See, e.g.*, *Edmunds v. U.S. Dep't of Justice*, 405 F. Supp. 2d 23, 33 (D.D.C. 2005).

Here, Plaintiffs seek the entire mosaic of the FBI's law enforcement strategies in a single

document.  Revealing such information would hamstring the FBI in its mission.  It has therefore

properly withheld information concerning its Policy Directives.

---

[4] The overarching category of "Operational Directives" substantially overlaps with more specific categories such as the scope of authorized activities.  *See generally* Hardy Decl. Ex. E (summary index of redactions).

              **b.**      <u>The FBI Properly Withheld Information About Classified</u>
                      <u>Presidential Anti-Terrorism Directives.</u>

The FBI also properly withheld two passages concerning certain classified Presidential

Directives, National Security Presidential Directive-46 ("NSPD-46") and Homeland Security

Presidential Directive-15 ("NSPD-15").  Presidential Directives are memoranda from the

President to his executive agencies directing them to perform certain tasks.  *Cf. Laudes Corp. v.*

*United States*, 84 Fed. Cl. 298, 307 (Ct. Cl. 2008) (describing NSPD-36).  In this case, the

classified Presidential Directives at issue describe the roles and responsibilities of the FBI (and

other agencies) in the United States' efforts to combat terrorism.  *See* Pistole Decl. ¶¶ 13, 33.

The FBI has identified two risks with revealing this information.  First, a terrorist with

knowledge about the Presidential Directives will be better equipped to predict which agencies

would be responsible for identifying or interdicting terrorist activity.  *See id.*  Second, describing

even generally the content of the classified Presidential Directives would identify for a foreign

source seeking to gain particular information about the operations of the United States' anti-

terrorism efforts a promising target for intelligence exploitation.  *See id.*  Since such activity

would be undoubtedly illegal, this identified risk is sufficient to justify withholding under

Exemption 7(E).  *See Mayer Brown LLP*, 562 F.3d at 1193.

              **c.**      <u>The FBI Properly Withheld Information About Unaddressed Work</u>

"Unaddressed work" is, as the name implies, work that the FBI has not yet completed.

The FBI has redacted from the DIOG four paragraphs that concern what is done with

unaddressed investigative leads—what specific information is maintained, how it is maintained

and where it is maintained.  *See* Pistole Decl. ¶¶ 14, 34.  Revealing this material could provide

potential criminal perpetrators with valuable information:  knowing where information on

unaddressed investigative leads is kept can provide a foreign intelligence or other criminal

operative with a source of information to exploit in efforts to determine whether the FBI is

following up on a particular lead, or has dropped it.  A foreign intelligence interest service

seeking to infiltrate the FBI to determine if it was subject to an ongoing FBI investigation would

be able to determine how and where this information might be kept.  *See id.*  Accordingly, the

FBI properly withheld this information.

> d.       The FBI Properly Withheld Information Regarding Its Collection
>           and Analysis of Information

A great deal of the DIOG concerns the way that the FBI collects information and

analyzes it.  *See* Hardy Ex. D at DIOG-12.  Specifically, the DIOG in many of its parts describes

the methods and techniques that the FBI uses to gather information along with how it analyzes

that information and uses it in investigations.  *See* Pistole Decl. ¶¶ 15, 35.  The FBI has, once

again, revealed much information about these activities, but cannot reveal more without

undermining its effectiveness.  Thus, for example, the FBI has revealed that it sometimes uses an

investigative technique known as a "mail cover" in which it records information on the outside

of mail being delivered to a particular person.  *See* Hardy Decl.  Ex. D at DIOG-127.  While the

FBI believes that it can release the fact that this particular method of intelligence collection

exists, it has redacted information about when, precisely, it is authorized.  *See id.*  This is because

knowing when such a collection technique is authorized can help a suspect modify his or her

behavior (*i.e.*, stop using mail) in circumstances during which a mail cover might be used.

Likewise, the FBI has redacted details about how information is analyzed and used.

Providing potential criminal suspects about what information is collected for use in particular

types of investigations can aid them in circumventing the law by encouraging them to use or not

use particular modes of communication or transportation and the like.  For example, the FBI has

revealed that it may use administrative subpoenas to obtain information in a case involving the

sexual exploitation or abuse of a child.  *See* Hardy Ex. D. at DIOG-164.  What it has not revealed

is *what* information it gathers, as doing so could reveal what behavioral patterns it is looking for

(*i.e.*, how it analyzes data) in these particular types of investigation.  Because the risk of

circumvention presented by revealing this sort of information, the FBI properly withheld these

passages of the DIOG.

   e. <u>The FBI Properly Withheld Information Regarding the Contents of Forms, File Numbers and Databases</u>

  As a procedural document, the DIOG is replete with information about where

information is stored, what types of information are stored and who has access to or reviews that

information.  *See* Pistole Decl. ¶¶ 16, 36.  The FBI has redacted much of this information from

the publicly-released DIOG.  Such information is of no interest to the general public, but it can

be particularly important to sophisticated criminal enterprises and foreign intelligence operatives

seeking to undermine the FBI's law enforcement efforts or to engage in espionage.  *See* Pistole

Decl. ¶¶ 16, 36.  To take but one example, the FBI has redacted a reference to a form connected

with undercover operations.  *See* Hardy Decl. Ex. D at DIOG-150.  Consider the case of a

sophisticated criminal seeking to undermine an FBI undercover operation by obtaining

information about an undercover investigation from an unwitting FBI employee by asking to see

a document about the the investigation.  Armed with the information redacted at DIOG-150, the

criminal's task is slightly easier—he or she now knows what specific form to request.  Similar

risks exist for foreign intelligence operatives seeking access to FBI materials.  *See, e.g.*, Hardy

Decl. Ex. D at DIOG-112 (redacting information concerning file numbers in foreign intelligence

context).  In view of these risks, the FBI properly withheld this sort of information pursuant to

Exemption 7(E).

f.     The FBI Properly Withheld Information Regarding Specific
       Individuals or Committees to Whom Information Must be
       Reported

Of a piece with concerns about identifying where information is stored, identifying

specific offices within the government where information is reported provides another avenue for

potential exploitation by criminal or foreign intelligence entities.  *See* Pistole Decl. ¶¶ 17, 37.

The FBI has redacted from the DIOG specific identifications of offices and entities that handle

particular kinds of requests.  For example, the DIOG identifies a particular office involved in

authorizing "pen register trap and trace devices."  *See* Hardy Decl. Ex. D at DIOG-195.  A

foreign intelligence entity learning that information about this particular type of activity filters

through a particular office will have an advantage in identifying individuals to target in

espionage activities.  *See* Pistole Decl. ¶¶ 17, 37.  Because of this risk, the FBI has properly

redacted such information.

g.     The FBI Properly Withheld Information Regarding Specific
       Scenarios in Which Particular Activities or Techniques are
       Authorized

In addition to providing general guidelines describing when particular types of

investigation can be conducted and under what circumstances techniques can be used, the DIOG

has a number of specific hypothetical examples illustrating more general principals.  *See* Pistole

Decl. ¶¶ 18, 38.  The FBI redacted these specific examples because they provide a potential

criminal with information about what specific activities will, or will not, trigger a potential FBI

investigation.  *See id.*  For example, the FBI has redacted parts of four pages which detail

specific scenarios in which the FBI may or may not open an "assessment," a type of initial

investigative activity.  *See* Hardy Decl. Ex. D at DIOG-51-54.  A person contemplating a

criminal activity knowing that a specific behavior is sufficient to support the FBI opening an

assessment could, naturally, avoid that particular behavior, thus avoiding investigative attention.

*See* Pistole Decl. ¶¶ 18, 38.  In short, revealing information in this category would permit a

potential criminal to conclude, "If I do *x*, the FBI can open an assessment, but if I do *y* it cannot,"

and accordingly modify his or her behavior to avoid an investigation.  This circumvention risk

justifies the FBI's decision to redact material of this sort.

   h. <u>The FBI Properly Withheld Information About the Scope of
Sensitive Investigative Matters</u>

   The DIOG contains specific rules that for types of investigations that are considered

"sensitive investigative matters."  *See* Hardy Decl. Ex. D at DIOG-119.  Such activities "have

special approval and reporting requirements."  *Id.*; *see also id.* at DIOG-120.  Likewise, certain

types of investigative activities are either barred or restricted in sensitive investigations.  *See*

Pistole Decl. ¶¶ 19, 39.  The FBI generally defines such activities as being those involving

certain political officials, political candidates, religious organizations and matters relating to

academic institutions.  *See* Hardy Decl. Ex. D at DIOG-119.  While the FBI has determined that

it is able to define some of the scope of such sensitive matters, it does not believe that it can

reveal other information, such as more specifically identifying what qualifies as a sensitive

investigation or what techniques are or are not allowed or are restricted in such a context.  *See*

Pistole Decl. ¶¶ 19, 39.  There is an obvious risk that if individuals or enterprises potentially

within the scope of "sensitive investigative matters " are able to determine this fact, they will be

emboldened to engage in criminal activities knowing that the FBI is subject to investigative

restrictions.  *See id.*  Moreover, there is a related risk that individuals or entities, knowing the

specific scope of sensitive investigative matters, will tailor their activities to fall within this

category, in order to make themselves more difficult to investigate.  *See* Pistole Decl. ¶¶ 20, 40.

Consequently, the FBI properly withheld these provisions of the DIOG.

        i.      The FBI Properly Withheld Specific Information About Specific
                Terms and Definitions

Related to and overlapping with its withholding information regarding sensitive

investigative matters, the FBI has withheld the definitions of certain types individuals or entities

that it deems to be the subject of such investigations.  *See* Pistole Decl. ¶¶ 20, 40.  Entities

seeking to evade detection may attempt to cast themselves in a manner to obtain this treatment

by the FBI in order to discourage the FBI from engaging in particular types of investigative

tactics and otherwise adjust the intensity of certain investigations, by choosing to not use

particular techniques in a potentially controversial context.  *See id.*  Thus, for example, an

otherwise criminal entity knowing the specific definition of "political organization," *see* Hardy

Decl. Ex. D at DIOG-119, may attempt to recast itself as such in order to gain the advantage of

more limited investigation tactics.  Because of this risk the FBI properly redacted these terms and

definitions.

        j.      The FBI Properly Withheld Information About Approval
                Limitations on Techniques or Procedures that May be Used In
                Certain Types of Investigation

The DIOG identifies for FBI employees what types of law enforcement activities are or

are not authorized, describes what the FBI will and will not do in the course of an investigation.

*See* Pistole Decl. ¶¶ 21, 41.  While general information about the scope of the FBI's law

enforcement activities is revealed in the unredacted portions of the DIOG, more specific

information about what constitutes approved activity (or what activity may be approved) cannot

be revealed without providing valuable information to potential lawbreakers.  The FBI has

redacted information about the scope of its approved activities for this very reason.  For example,

the FBI has redacted portions of the DIOG governing when the FBI may request information

from a third party without revealing the purpose of the request or the fact that the request comes

from the FBI.  *See* Hardy Decl. Ex. D. at DIOG-75-76.  Knowing when such behavior is

authorized can help an individual evade detection by the FBI.  A criminal could tell an associate

to never reveal information to someone asking in a particular setting, thereby making it harder

for the FBI to detect criminal behavior.

>   k.     The FBI Properly Withheld Information About Technical or
>          Practical Limitations on Particular Investigative Techniques

While the FBI has identified most of the investigative techniques in the DIOG, it has

determined that it cannot reveal certain technical or practical limitations on their use.  *See* Pistole

Decl. ¶¶ 22, 42.  Thus, for example, the FBI has revealed in one section of the DIOG the

existence of "Pen Registers" and "Trap and Trace Devices" which allow for the collection of

information from wire communications like records of phone numbers dialed from a particular

telephone.  *See* Hardy Decl. Ex. D at DIOG-192.  Such technologies have technical limitations,

however.  There may be data or types of information that they cannot gather.  Knowing this

information would be invaluable to someone attempting to hide criminal activities from the FBI.

Accordingly, the FBI has redacted such information later in the same section of the DIOG.  *See*

*id.* at DIOG-198.  Because revealing such information presents a risk that criminal elements will

be able to evade detection, material of this sort is properly redacted from the document.

16

l.      The FBI Properly Withheld Information on its Policies Concerning Cooperation with State, Local, Tribal and Foreign Law Enforcement

The DIOG also describes situations in which the FBI cooperates with law enforcement entities in other jurisdictions both inside and outside of the United States.  *See* Hardy Decl. Ex. D at DIOG-232.  Such cooperation, however, is limited by FBI policy.  While the FBI has revealed the general parameters of that policy, it has redacted specific explanations.  *See id.*  This is because specifying when the FBI might cooperate with such agencies may assist criminals in tailoring their behavior to avoid federal involvement in particular investigations, thus avoiding the more rigorous scrutiny that can come with superior federal investigative resources.  *See* Pistole Decl. at ¶ 23, 43.

m.      The FBI Properly Withheld Information on Limitations on Certain Domestic Investigative Activities that have Foreign Impacts

There is a brief portion of the DIOG, *see* Hardy Decl. Ex. D at DIOG-238, that describes certain domestic investigative activities that may have an effect in foreign countries.  The DIOG provides that these specific activities are subject to special approvals.  *See id.* at DIOG-239.  The redacted material specifically identifies those activities.  Knowing that these techniques are restricted in their use can aid a would-be lawbreaker by encouraging him or her to keep information or conduct activities in ways that are only detectable through these particular methods.  *See* Pistole Decl. ¶ 24, 44.  Because revealing this information could make the FBI's enforcement task more difficult, it is properly redacted.

n.    The FBI Properly Withheld Information Concerning Undisclosed
      Participation

The FBI has redacted fourteen pages concerning "undisclosed participation."

Undisclosed participation "takes place when anyone acting on behalf of the FBI, including but

not limited to an FBI employee or confidential human source (CHS), becomes a member or

participates in the activity on behalf of the U.S. Government without disclosing FBI affiliation to

an appropriate official of the organization."  Hardy Decl. Ex. D at DIOG-253.  A person engaged

in such an activity, such as infiltrating an organized crime front organization, can be exposed to

obvious and considerable risk.  *See* Pistole Decl. ¶¶ 25, 45.  Likewise, if an undisclosed

participant is discovered, a law enforcement operation can be compromised.  *See id.*  The DIOG

chapter on undisclosed participation specifically describes what activities are considered to be

undisclosed participation, under what circumstances they are allowed, and what an undisclosed

participant may or may not do.  Revealing such information could allow an infiltrated

organization to devise a "test" to detect such activity, threatening the effectiveness of an FBI

operation and the physical safety of its participants.  *See id.*  Accordingly, the FBI properly

redacted this material.

o.    The FBI Properly Withheld Information Concerning the Duration
      of Particular Techniques

The DIOG contains time limitations governing how long a particular type of investigative

activity can be conducted.  *See* Pistole Decl. ¶¶ 26, 46.  In eight places, the FBI has redacted this

information because it has determined that revealing the information may increase the risk of

circumvention of the law or the FBI's enforcement activities.  *See id.*  An example of this sort of

redaction appears at DIOG-150.  This particular redaction appears within a section of the DIOG

concerning undercover operations.  *See* Hardy Decl. Ex. D at DIOG-147, 150.  It describes for

how long the FBI may conduct an undercover operation.  A person suspecting that he or she is

subject to an undercover operation would be greatly aided by this information, if he or she were

considering whether to engage in illegal behavior.  Knowing a time limit of this source would

encourage a suspect to "lay low" for the appropriate period of time before re-engaging in illicit

behavior.  *See* Pistole Decl. ¶¶ 26, 46.

         p.     The FBI Properly Withheld Information Concerning Surveillance and Monitoring

The FBI has withheld a number of passages that more completely describe its

surveillance and monitoring activities.  *See* Pistole Decl. ¶ 27.  This type of redaction overlaps

with other types of redactions in the DIOG (such as approval limits on various techniques and

the identification of the contents of forms and databases), but is separately described by the FBI

to protect specific details of its surveillance and monitoring techniques.  Again, the FBI has

attempted to reveal as much as possible without compromising its effectiveness.  Thus, for

example, it has revealed portions of a section of the DIOG concerning the consensual monitoring

of communications.  *See* Hardy Decl. Ex. D at DIOG-133-140.  On several pages, however, it

has redacted certain limitations on that technique where a party to the communication is outside

of the United States or other sensitive circumstances exist.  *See id.* at DIOG-135-38.

Understanding the limitations of this technique can help potential criminals avoid detection by

the FBI.  This increased risk justifies the FBI's redaction of this and similar material.

q.      The FBI Properly Withheld Information Concerning Obscure
        Capacities and Investigation Techniques

In a handful of places, the FBI has redacted information that identifies particular devices

and technologies it uses in its investigations.  *See* Pistole Decl. ¶¶ 28, 48.  These technologies

and techniques are not well known.  *See id.*  Naturally, the FBI cannot say substantially more

than it has about these technologies without identifying them and thereby reducing their

effectiveness.  Since the FBI has determined that revelation of this information could allow

criminals to anticipate cutting edge FBI techniques and appropriately modify their behavior, this

information was properly redacted.

r.      The FBI Properly Withheld Internal Web and E-mail Addresses
        and Phone Numbers

Finally, in eight places the FBI has redacted internal website addresses and phone

numbers.  *See* Pistole Decl. ¶¶ 29, 49.  These bits of information, while of no moment to the

general population can be useful to those who intend to disrupt the FBI's law enforcement

efforts.  If these numbers were widely circulated, they could be used to harass particular

individuals within the FBI, necessarily reducing the FBI's effectiveness.  *See id.*  Accordingly,

this information is properly redacted.

2.      The Redacted Portions of the DIOG are Categorically Exempt from
        Disclosure under Exemption 7(E).

Though the FBI has made an ample showing of the risks presented by the disclosure of

the information it seeks to protect under Exemption 7(E), such a showing is not necessary under

the first clause of the exemption because the DIOG is almost exclusively concerned with law

enforcement "procedures and techniques."  *See infra* at 6.  Whereas information coming within

the second clause of Exemption 7(E)—concerning "guidelines for law enforcement

investigations or prosecutions—can be withheld only upon a showing that "disclosure could

reasonably be expected to risk circumvention of the law," information coming within the first

clause—relating to law enforcement "procedures and techniques"—receives categorical

protection under Exemption 7(E).  *See, e.g.*, *Keys*, 510 F. Supp. 2d at 129.  In this case, as

Deputy Director Pistole explains, "the rules and procedures in the DIOG affect virtually all of the

FBI's investigative activities and techniques."  Pistole Decl. ¶ 10.  And as described above, the

redacted portions of the DIOG generally concern such topics as guidelines establishing when

particular techniques may be used, what information is required to use those techniques, the

procedures for obtaining authorization to use those techniques and even identifies the techniques

themselves.  The DIOG is a self-evidently procedural document and the information withheld

under FOIA exemption 7(E) is entitled to categorical protection.

     **C.**     **The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA Exception (b)(2).**

Information that is "related solely to the internal personnel rules and practices of an

agency" is exempt from disclosure pursuant to Exemption 2.  5 U.S.C. § 552(b)(2).  This

exemption has been held to protect two types of information:  (1) internal information which, if

released, could lead to circumvention of agency regulations and statutes (known as "high 2"

information), and (2) "routine matters of merely internal interest" (known as "low 2"

information).  *Crooker*, 670 F.2d at 1069, 1074.  *See also Founding Church of Scientology of

Washington, D.C., Inc. v. Smith*, 721 F.2d 828, 831 n.4 (D.C. Cir. 1983) (material is exempt if it

"relates to trivial administrative matters of no genuine public interest"); *Schiller v. NLRB*, 964

F.2d 1205, 1207 (D.C. Cir. 1992) (distinguishing between "high 2" and "low 2" exemptions).

Here, the FBI has properly withheld materials under both the "high 2" and "low 2" exemptions.

1.   The FBI Properly Withheld Portions of the DIOG Under the "High 2" Exemption.

The facts in this case closely resemble those in *Crooker*, a case which established the key criteria for invoking Exemption (b)(2) in this jurisidction.  In *Crooker*, a FOIA claimant sought a copy of the Bureau of Alcohol, Tobacco and Firearms's ("BATF") training manual for "Surveillance of Premises, Vehicles and Persons."  *Crooker*, 670 F.2d at 1053.  The BATF, like the FBI in this case, released some, but not all, of the requested manual.  *Id.*  In upholding the BATF's position, the circuit court explained that "if a document for which disclosure is sought meets the test of 'predominant internality,' and if disclosure significantly risks circumvention of agency regulations or statutes, then Exemption 2 exempts the material from mandatory disclosure."  *Id.* 1054.  The DIOG, like the BATF's training manual, easily meets this standard.

a.   The DIOG's Provisions are Predominantly Internal.

There can be no reasonable dispute that the DIOG is a predominantly internal document. The DIOG contains "specific internal rules and procedures that are used by the FBI."  Pistole Decl. ¶ 10.  Indeed, the FBI has made clear that "[t]he [Attorney General's Guidelines] and this DIOG are set forth solely for the purpose of internal DOJ and FBI guidance."  Hardy Decl. Ex. D at DIOG-21.  The document covers such internal administrative matters as where information is recorded (*see* Pistole Decl. ¶ 16), to whom it is reported (*see id*. ¶ 17), and internal phone numbers and e-mail addresses (*see id.* ¶ 29).  Even more substantive provisions of the DIOG, such as the types of activities approved for use at different times, *see id.* ¶ 20, concern matters internal to the FBI.

22

What the DIOG does *not* contain is "secret law" that governs the actions of society at large.  Instead, the DIOG merely describes, for the internal audience of the FBI, what investigative techniques are available and how to deploy them.  *See, e.g.*, *PHE*, 983 F.2d at 251 (finding FBI investigative guidelines properly withheld under Exemption (b)(2)).  In this way, the DIOG is distinct from the prosecutorial guidelines held not predominantly internal in *Jordan v. United States Department of Justice*, 591, F.2d 753 (D.C. Cir. 1978).  As the District of Columbia Circuit recently reaffirmed, the *Jordan* decision involved guidelines for prosecutorial discretion, which instructed agency personnel on how to regulate members of the public.  *See Public Citizen v. Office of Mgmt. & Budget*, 569 F.3d 434, 439 (D.C. Cir. 2009).  By contrast, the *Crooker* court found that the BATF surveillance manual "consisted solely of instructions to agency personnel" and was not aimed at regulating public behaviors.  *See id.* (quoting *Crooker*, 670 F.2d at 1075).  Here, the DIOG is far closer to the *Crooker* training manual than it is to a prosecution manual.  *See also PHE*, 983 F.2d at 251 (permitting withholding of portions of FBI investigatory manual).  Because it is not intended to regulate the general public's behavior, the DIOG is properly considered a predominantly internal document.

b.   Revelation of the information in the DIOG would present a serious risk of circumvention of the law and the FBI's enforcement efforts.

As described in Section I.A. above, revealing the redacted portions of the DIOG would increase the risk of circumvention of the law and the FBI's efforts to enforce the law.  Accordingly, the material is properly withheld under Exemption (b)(2) as well as (b)(7)(E).  *See PHE*, 983 F.2d at 251.

2.     The FBI Properly Withheld Portions of the DIOG Under the "Low 2"
       Exemption.

Certain of the redacted materials that Plaintiff appears to challenge are also independently

exempt from disclosure under the "low 2" protections for trivial information of no interest to the

public.  *See, e.g.*, *Schiller*, 964 F.2d at 1207 (D.C. Cir. 1992).   Information such as where

unaddressed work is kept (*see* I.A.2), what forms are filled out and what file numbers are used

(*see* I.A.5), to whom information is reported (*see* I.A.6) and internal phone numbers (*see* I.A.18)

are of no interest to the general public.  They are therefore quintessential "low 2" information

properly withheld from public disclosure.

**C.     The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA
         Exemption (b)(5).**

Exemption 5 protects from mandatory disclosure "inter-agency or intra- agency

memorandums or letters which would not be available by law to a party other than an agency in

litigation with the agency." 5 U.S.C. § 552(b)(5). In particular, it protects information "normally

privileged in the civil discovery context."  *NLRB v. Sears Roebuck & Co.*, 421 U.S. 132, 149

(1976).  Information covered by the deliberative process privilege thus can be properly withheld

by an agency pursuant to Exemption 5.  C*oastal States Gas Corp. v. Dep't of Energy*, 617 F.2d

854, 862 (D.C. Cir. 1980). The deliberative process privilege applies to "decisionmaking of

executive officials generally," and protects documents containing deliberations that are part of

the process by which government decisions are formulated.  *In re Sealed Case*, 121 F.3d 729,

737, 745 (D.C. Cir. 1997).  This privilege is intended to encourage frank discussion of legal and

policy issues within the government and to protect against public confusion resulting from

disclosure of reasons and rationales that were not ultimately the bases for governmental action. *See, e.g.*, *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993); *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982).  Records are encompassed by the deliberative process privilege if they are both "predecisional" and "deliberative."  *Coastal States*, 617 F.2d at 866.  A document is predecisional if it was "prepared in order to assist an agency decisionmaker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Formaldehyde Inst. v. Dep't of Health & Human Serv.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (internal quotations omitted).  A predecisonal document is, in turn, deliberative if "disclosure of [the document] would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  *Id.* (internal quotations omitted).

Here, the FBI properly invoked Exemption (b)(5) to withhold draft information concerning an as-yet unformed committee that is expected to be called the Special Operations Review Committee.  *See* Hardy Decl. ¶ 28.  The provisions are predecisional, because, as explained by Mr. Hardy, "the FBI is still defining the role, responsibilities and composition of the SORC."  *Id.*  Revealing the draft provisions regarding how the SORC may possibly be comprised would prematurely subject the FBI's work-in-progress to public scrutiny would potentially chill further deliberations about the makeup of this contemplated committee or the sharing of proposed amendments to this draft upon fear that such communications would be publicly exposed.  The release of this work-in-pogress could furthermoreconfuse the public

which could be misled by the document to understand that the SORC has already been formed

and its membership defined.

> **D.    The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).**

In one place, the FBI has redacted the name of a single FBI employee.  *See* Hardy Decl. ¶

41 &. n.10.  Exemptions (b)(6) and (b)(7)(C) protect such information from disclosure where the

withholding agency determines that, on balance, the employee's privacy interest outweighs

public interest in disclosure of the information.  Here, the FBI has made such a determination.

*See id.*  This particular individual is identified within the FBI as the point of contact for the entire

DIOG.  Members of the public who might be concerned about the content of the DIOG or about

the conduct of a particular investigation may be tempted to contact this individual to complain or

harass this individual.  This invasion on both the individual's privacy and day-to-day work is

unwarranted.  Consequently, this material is properly redacted.  *See, e.g.*, *Nix v. United States*,

572 F.2d 998, 1006 (4th Cir. 1978).

> **E.    The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA Exception (b)(7)(A).**

The FBI invoked FOIA Exemption (b)(7)(A) in two places.  FOIA Exemption (b)(7)(A)

exempts from disclosure "information compiled for law enforcement purposes, but only to the

extent that production of such law enforcement records or information . . . could reasonably be

expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  As described

above, *see* Part I.A.7, the DIOG contains specific examples of scenarios in which particular

activities are or are not authorized.  While most of these examples are hypothetical, one example

(repeated in two places) is based on an ongoing investigation into an actual subject.  *See* Pistole

Decl. ¶¶ 18, 38; Hardy Decl. ¶ 32.   The FBI is reasonably concerned that revealing this

particular subject would potentially undermine its investigation.  *See id.* ¶¶ 33-35.

> **F.**     **The FBI Properly Redacted Portions of the DIOG Pursuant to FOIA Exemption 1.**

FOIA Exemption 1 allows an agency to protect records that are:  (1) specifically

authorized under criteria established by an Executive Order to be kept secret in the interest of

national defense or foreign policy, and (2) are in fact properly classified pursuant to Executive

Order. See 5 U.S.C. § 552 (b)(1).  Exemption One thus "establishes a specific exemption for

defense and foreign policy secrets, and delegates to the President the power to establish the scope

of that exemption by executive order."  *Military Audit Project v. Casey*, 656 F.2d 724, 737 (D.C.

Cir. 1981).  Section 1.2(a)(4) of Executive Order 12958, as amended, states that an agency may

classify information that fits into one or more of the Executive Order's categories for

classification when the appropriate classification authority "determines that the unauthorized

disclosure of the information reasonably could be expected to result in damage to the national

security."  68 Fed. Reg. 15315, 15315 (Mar. 25, 2003).

The issue for the Court is whether "on the whole record, the Agency's judgment

objectively survives the test of reasonableness, good faith, specificity and plausibility in the field

of foreign intelligence in which [the agency] is expert and has been given by Congress a special

role."  *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982).  Although the agency bears the

burden of proving its claim for exemption, see 5 U.S.C. § 552(a)(4)(B), because agencies have

"unique insights" into the adverse effects that might result from public disclosure of classified

information, the courts must accord "substantial weight" to an agency's affidavits justifying

classification.  *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984); *Military Audit Project*, 656

F.2d at 738.  As the D.C. Circuit has noted, "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Center for Nat'l Sec. Studies v. United States Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003).

Here, Mr. Hardy has conducted an independent review of the redacted passages containing classified information and concluded that they contain "detailed intelligence information on specific individuals or organizations of national security interest," Hardy Decl. ¶ 17, which, if released could cause significant damage to the United States' national interest.  *See id.*  It is clear from context that the provisions concern investigative activities involving foreign nations.  For example, there are redacted provisions titled "Determination of United States Person Status" and "Assistance to and/or From Foreign Agencies."  *See id.* Ex. D at DIOG-381. Likewise, there are unredacted provisions concerning a Memorandum of Understanding with the Department of State.  *See id.* at DIOG-382.  Finally, there are unreadacted provisions referring to national security investigations.  *See id.* at DIOG-383.  Taken together, the unredacted portions surrounding the classified materials make clear that the redacted provisions relate to the national security interest and United States foreign relations.  While the FBI has concluded that more cannot be said about the redacted passages without revealing classified information, it is apparent that they were properly redacted.

<u>CONCLUSION</u>

The FBI is justified in withholding the information described above.  It has affirmed that there is no more reasonably segregable information that it can share with Plaintiff.  *See* Hardy

Decl. ¶ 44.  Accordingly, the Department of Justice respectfully requests that the Court enter

judgment in its favor.

Dated:  November 13, 2009                    Respectfully submitted,

                                             TONY WEST
                                             Assistant Attorney General

                                             JOHN R. TYLER
                                             (D.C. Bar No. 297713)
                                             Assistant Director
                                             Civil Division

                                               /s/Bryan R. Diederich
                                             Bryan R. Diederich (MA BBO # 647632,
                                             NY Reg. # 4216164)
                                             Trial Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box 883, Room 7109
                                             Washington, D.C. 20530
                                             Tel:  (202) 305-0198
                                             Fax:  (202) 616-8470
                                             E-mail:  bryan.diederich@usdoj.gov

                                             Attorneys for Defendant