IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION )<br><br>Plaintiff, )<br><br>v. )<br><br>DEPARTMENT OF JUSTICE, )<br><br>Defendant. ) | Civ. A. No. 09-cv-1151 |

## DECLARATION OF JOHN S. PISTOLE

I, John S. Pistole, declare as follows:

(1)     I am currently the Deputy Director of the Federal Bureau of Investigation located

in Washington, D.C. I have held this position since October 4, 2004. I began my career as a

Special Agent with the FBI in 1983. I served in the Minneapolis and New York Divisions before

being promoted to a Supervisor in the Organized Crime ("OC") Section at FBI Headquarters. I

assisted the Italian National Police in their investigations into the 1992 assassinations of two

prominent Magistrates. I also served as an Instructor in OC matters at the FBI Academy for

nearly 30 New Agent Classes. I later served as a field supervisor of a White-Collar Crime

(WCC) and Civil Rights Squad in Indianapolis, Indiana, where I created a Health Care Fraud

Task Force and a Public Corruption Task Force. During this time, I also developed curricula and

provided instruction at the International Law Enforcement Academy in Budapest, Hungary. I

next served as Assistant Special Agent in Charge in the Boston Division, where I had oversight

for WCC, Computer Intrusion Programs, and all FBI matters in the States of Maine and New

Hampshire and WCC, especially Public Corruption, in Rhode Island. In 1999, I helped lead the investigative and recovery efforts for the Egypt Air Flight 990 crash off the coast of Rhode Island. Following the espionage arrest of Robert Hanssen, I was detailed to FBIHQ and helped lead the Information Security Working Group, addressing security and vulnerability issues. In 2001, I was named an Inspector in the Inspection Division in Washington, D.C., where I led teams conducting evaluations and audits of FBI field offices and Headquarters divisions. Following the events of 9/11, I was appointed by Director Mueller to the Counterterrorism Division, first as Deputy Assistant Director for Operations, then as Assistant Director. I was then appointed as the Executive Assistant Director for Counterterrorism and Counterintelligence. In October 2004, I was promoted to Deputy Director, the number two position in the FBI. I am a recipient of the 2005 Presidential Rank Award for Distinguished Executive. In 2007, I received the Edward H. Levy Award for Outstanding Professionalism and Exemplary Integrity. I am also an attorney who has been licensed to practice law in the State of Indiana since 1981. I practiced law for two years prior to joining the FBI. I am a graduate of Anderson University (Indiana) and the Indiana University School of Law - Indianapolis.

(2)     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon consensus and determinations reached and made in accordance therewith.

(3)     As part of an outreach program to obtain input regarding the possible impact on civil rights and civil liberties of certain provisions of the FBI's Domestic Investigation and Operations Guide ("DIOG"), the FBI invited several civil rights and civil liberties groups to

meetings at which time they were given the opportunity to preview certain provisions of the draft

DIOG and to provide comments. There were two meetings, one for civil rights groups on

November 19, 2008 and one for civil liberties groups on November 25, 2008.[1]  There were also

separate meetings held for Congressional staffers.

(4)     At each meeting, Valerie Caproni, the General Counsel of the FBI, made a

presentation of about 30 minutes on the DIOG, which included a Power Point presentation. The

groups, each one consisting of approximately three to five individuals, were then left with drafts

of DIOG Chapters 4, 5, 10 and 16 for approximately an hour and a half. They were advised that

they could not make copies or take notes and that they could not retain the copies they were

permitted to read. Ms. Caproni also made it clear to the attendees that the briefing was designed

to explain, in a general sense, the purpose and content of these chapters and to solicit their

comments and reactions; and that the briefing should not be viewed as a public release of the

draft DIOG chapters. No other disclosures of the redacted portions of the DIOG have been

authorized. To my knowledge no other such disclosures have been made.

(5)     Were these activities deemed to waive or undermine the FBI's ability to protect

information under the FOIA, the FBI would hesitate to hold similar public outreach programs for

any future DIOG editions as well as any other procedural manuals or guides which might impact

---

[1]Present at the November 19th  meeting were: Brenda Abedellal of the Muslim
Advocates, Abed Ayoub of the American-Arab AntiDiscrimination Committee, Safiya Ghori-
Ahmad of the Muslim Public Affairs Council and Maya Asis. Present at the November 25th
meeting were: David Sobel of the Electronic Frontier Foundation, Marc Rotenberg of the
Electronic Privacy Information Center, Greg Nojeim of the Center for Democracy and
Technology and Kate Martin of the Center for National Security Studies.

on civil rights or civil liberties.

    (6)    This declaration, which is being submitted in support of defendant FBI's motion

for summary judgment, will provide the Court and plaintiff with an explanation and a

justification for the withholding certain FBI information from disclosure, in full or in part,

pursuant to FOIA Exemptions 2 and 7(E), 5 U.S.C. §§ 552 (b)(2) and (b)(7)(E).

    (7)    The DIOG contains several categories of information involving the FBI's

techniques and procedures that, if released, would cause harm to FBI's criminal and national

security investigations. The Hardy declaration, contemporaneously filed in this case, discusses in

detail the standards under which the FBI seeks to withhold that information. This declaration

explains the rationales for withholding information in the following categories:

- Information about the FBI's Operational Directives;

- Information concerning certain classified Presidential directives (NSPD-14/HSPD-15);

- Information concerning the FBI's treatment of Unaddressed Work;

- Information concerning the FBI's Collection and/or Analysis of Information;

- Information identifying the contents of particular File Numbers, Identifying Symbols, Forms and Databases;

- Identification of Specific Individuals or Committees to Whom Information is Reported;

- Specific Scenarios in Which Particular Activities or Techniques are Authorized;

- The Scope of Sensitive Investigative Matters;

- Certain <u>Terms and Definitions;</u>

- <u>Approval Limitations on Techniques or Procedures that Cannot be Used in</u>
  <u>Certain Types of Investigations;</u>

- <u>Technical or Practical Limitations on Particular Investigative Techniques;</u>

- <u>Policies on Cooperation with State, Local, Tribal and Foreign Law Enforcement;</u>

- <u>Limitations on Certain Domestic Activities with Foreign Impact;</u>

- Information about <u>Undisclosed Participation;</u>

- Information on the <u>Duration</u> for which particular actions are authorized;

- <u>Surveillance and Monitoring Information;</u>

- <u>Identification of Obscure Capacities and Investigative Techniques;</u> and

- <u>Internal Web, E-Mail Addresses and Phone Numbers.</u>

(8)     The FBI's rationales for withholding this information must be understood in the

larger context of the current security and criminal prosecution climate.  In addition to combating

the criminal acts of sophisticated illicit enterprises (such as organized crime syndicates and drug

cartels), the FBI is also charged with protecting the nation from security risks posed by

individuals, organizations (such as terrorist groups), and foreign nations that seek to harm the

United States.  The FBI's public disclosure of information is carefully scrutinized by the enemies

of the United States.  Intelligence services and terrorists use open-source information to gather

intelligence about United States's capabilities and methods.  An Al Qaeda training manual claims

that information needed about the "enemy" (meaning the United States) is available from public

sources.[2]  Similarly, in "Sources and Techniques of Obtaining National Defense Science and

Technology Intelligence," two intelligence teachers at China National Defense, Science and

Technology Information Center, emphasize that only 20% or less of Chinese intelligence must

come through collection of information using special means. This leaves a vast majority, 80%,

that comes simply from person-to-person exchanges and public information.[3]

      (9)     Moreover, that which is public can be used to guide an entity or individual

seeking access to non-public information.  Seemingly mundane details about internal documents

and procedures can help identify targets for intelligence exploitation.  Such actions are a crime,

and in order to prevent or deter such crimes, the FBI must be guarded in its release of details

about its internal practices, procedures and policies.  With these concepts in mind, I will now

discuss in detail each of the categories, the portions of the DIOG  under which each category falls

and the rationale for withholding the information within that category.

### (b)(2)     Investigative Techniques and Procedures

      (10)    The FBI has asserted FOIA Exemption (b)(2) in conjunction with (b)(7)(E) to

protect information consisting of specific internal rules and procedures that are used by the FBI.

The rules and procedures in the DIOG affect virtually all of the FBI's investigative activities and

techniques.  *See* DIOG-12.  To describe this information in further detail on the public record

---

    [2] UK BM75 translation of the Al Qaeda manual, eleventh lesson located by the
Manchester (England) Metropolitan Police. *See* http://cryptome.org/alq-terr-man.htm#11.

    [3] "Sources and Techniques of Obtaining National Defense Science and Technology
Intelligence" by Huao Zhongwen and Wang Zongxiao, Chapter 4: National Defense S&T
Intelligence Sources Discussed, Sections VII and VIII.

would identify the very information which the FBI seeks to protect pursuant to these exemptions. As described more specifically below, the revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use these important national security law enforcement techniques. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(2).[4]

### Justification of Specific Redactions of Investigative Techniques and Procedures.

(11)    What follows are descriptions of the rationales for the specific redactions taken under Exemption (b)(2), with as much information as the FBI can provide on the public record about the redacted material without potentially increasing the risk that FBI techniques or procedures will be circumvented or potential lawbreakers will be encouraged to engage in illegal activities. As described in paragraphs (8) and (9), those who pose a threat to our national security are adept at gaining access to public information that is meaningful to them; they are also adept at piecing together and analyzing a mosaic of information. For this reason, the risk posed by public release of all of the DIOG sections addressed below should be viewed as greater than the sum of the risk to each section--i.e., the cumulative risk must be considered.

(12)    Operational Directives. Operational Directives consist of the policies and

---

[4]Exemption (b)(2) is cited as a basis for withholding information on the following Bates-stamped pages of the DIOG:  DIOG-19-20, 28, 50-54, 57-73, 75-86, 89-91, 93-94, 96, 98-99, 101, 103-104, 107, 109-110, 112, 116, 119-122, 127-131, 135-139, 141-145, 147, 150-152, 155, 157, 163-165, 167-168, 170-177, 180-191, 193, 195-205, 207-213, 221-223, 226, 228, 232-238, 247-248, 250-267, 269, 363-364, 366-369, 372 and 378-383.

procedures, standards, or strategies contained within the DIOG. The DIOG contains descriptions

of substantially all of the FBI's procedures, techniques and strategies for conducting

investigations. If revealed in its entirety, it would provide individuals and entities with a look

inside the FBI's law enforcement and national security "playbook." Moreover, the fact that the

DIOG consolidates diverse sources of information makes its complete revelation even more

problematic. While different entities and individuals may lack the capacity to gather discrete

pieces of information to form a picture of the FBI's strategies, the DIOG does that work for them.

Consequently, its revelation would increase the risk that targets of investigations could avoid

detection or develop countermeasures to circumvent the ability of the FBI to effectively use these

important national security law enforcement techniques.[5]

---

[5] Exemption (b)(2) has been asserted to protect Operational Directives on the following Bates-stamped pages of Exhibit D: DIOG-19-20 (all redactions), 28 (all redactions), 50 (first redaction) 51 (first redaction), 57 (last three redactions), 58 (all redactions), 59 (second redaction), 60 (first two redactions), 61 (second redaction), 62 (all redactions), 63 (fourth redaction), 64 (all redactions), 65 (first, third and fourth redactions), 66 (second redaction), 67 (all redactions), 68 (second and third redactions), 70 (first redaction), 73 (all redactions), 75-76 (all), 77 (first two redactions), 80-81 (all redactions), 84 (last two redactions), 85-86 (all redactions), 90-91 (all redactions), 93 (all redactions), 94 (last three redactions), 96 (all redactions), 99 (all redactions), 101 (all redactions), 103-104 (all redactions), 107 (second redaction), 109 (all redactions), 112 (all redactions), 116 (all redactions), 120-121 (all redactions), 122 (first and second redactions), 136-139 (all redactions), 141 (first two redactions), 142 (all redactions), 143 (all redactions), 145 (all redactions), 147 (all redactions), 150-152 (all redactions), 155 (all redactions), 157 (all redactions), 163-165 (all redactions), 167-168 (all redactions), 170-177 (all redactions), 180 (all redactions), 181 (all redactions), 182 (first redaction), 183 (last two redactions), 184-190 (all redactions), 191 (first, second and fourth redactions) 193 (first three redactions), 195-204 (all redactions), 207 (last five redactions), 208-213 (all redactions), 221 (last four redactions), 222-223 (all redactions), 226 (all redactions), 228 (all redactions), 232-234 (all redactions), 235 (first five redactions), 236 (last three redactions), 237-238 (all redactions), 247 (all redactions), 248 (first and third redactions), 250 (all redactions), 253 (all redactions), 254 (first two redactions), 256 (ninth redaction) 257 (last six redactions), 258-262 (all redactions), 267 (all redactions), 269 (all redactions), 379-382 (all redactions).

(13)   <u>NSPD-46/HSPD-15/Presidential/Anti-Terrorism Directives</u>.  The DIOG contains

a description of material contained in an Annex to NSPD-46/HSPD-15/Presidential/Anti-

Terrorism Directives and classified Presidential Directives concerning the United States' ongoing

battle against terrorism.  While the description itself is not classified, it does describe the

information and guidance provided to the FBI and other federal entities regarding their roles and

responsibilities in the ongoing effort to defeat terrorism.  Release of the redacted information

could risk circumvention of the law in two ways.  First, identification of the matters covered by

the Annex will provide potential terrorists with information about the activities that are governed

by the Annex and, therefore, within the purview of more than one agency.  Second, revealing this

general description of the Annex may entice those interested in conducting espionage against the

United States to seek a copy of the NSPD-46/HSPD-15/Presidential/Anti-Terrorism Directives

and its Annexes.[6]

(14)   <u>Unaddressed Work</u>.  The DIOG contains a description of procedures with respect

to unaddressed work, i.e., work that the FBI has not yet completed.  The redacted material

concerns the disposition and use of materials associated with unaddressed work.  This

information describes internal FBI procedures of no interest to the general public.  However, its

release could encourage circumvention of the law because describing the sort of information that

is maintained and describing how and where it is maintained presents a target for entities or

individuals seeking to engage in espionage.  Further, this section of the DIOG not only defines

---

[6] These redactions appear at DIOG-19-20.

"unaddressed work" but provides insight into how the FBI determines what can be so categorized. This information, read in conjunction with other sections of the DIOG that describe the FBI's top priorities and the predication for opening an investigation, provide a road map as to the areas the FBI may not, at the present time, be fully addressing. The revelation of this material may alter a potential lawbreaker's risk-benefit analysis with respect to engaging in illegal activity, as it covers the allocation of the FBI's investigative resources and limitations on FBI activities when the FBI lacks investigatory resources.[7]

(15)   Collection and/or Analysis of Information. Since 9/11 and especially after the enactment of the Intelligence Reform and Terrorist Prevention Act of 2004 (IRTPA), the FBI has been transforming itself into an intelligence-driven agency to aid its paramount mission of detecting and preventing harm to the national security before it happens. Two essential components of this effort--indeed the sine qua non of the mission--are the collection and analysis of information. The FBI has fully described this new mandate under IRTPA to the American public--but it has not disclosed in detail the methods by which the mission will be accomplished. The DIOG describes numerous methods that the FBI uses to collect and analyze the information that it obtains for investigative purposes. The release of this information would disclose the methods used to collect and analyze information. Such disclosures could enable subjects of FBI investigations to circumvent similar, currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This, in

---

[7] This redaction appears at DIOG-28.

turn, would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques can be used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals, terrorists and spies, to educate themselves about the techniques employed for the collection and analysis of information; that education in turn, might allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities.[8]

(16)   Identification and Contents of File Numbers, Forms and Databases. Throughout the DIOG, there are references to specific file numbers and procedures and the information recorded on specific forms and maintained in specific non-public databases. These references identify where within the FBI particular sorts of information are recorded, including disclosing particular information that is contained within specific proprietary FBI databases. While this information relates to internal FBI procedures and is of no interest to the general public, it could be of great interest to entities seeking to engage in espionage against the United States by directing them to the precise location where the FBI stores secret information about national security and terrorism investigations. In addition, if we were to disclose the types of information

_____

[8] These redactions appear at DIOG-69 (all redactions), 82 (all redactions), 127-129 (all redactions), 131 (second redaction), 145 (all redactions), 147 (all redactions), 150 (all redactions), 152 (all redactions), 164 (first three redactions), 165 (all redactions), 167-168 (all redactions), 170-176 (all redactions), 180 (all redactions), 182 (first redaction), 183 (last two redactions), 184 (all redactions), 185 (last two redactions), 186 (all redactions), 188-190 (all redactions), 191 (first two redactions), 212-213 (all redactions), 248 (first redaction), 252-253 (all redactions), 254 (first two redactions), 256 (ninth redaction), 257 (last six redactions), 258-262 (all redactions), 267 (all redactions), 269 (all redactions).

needed to authorize use of particular investigative techniques, we would be assisting a potential

criminal by identifying information to obscure or hide in order to "cover one's tracks" and thwart

FBI investigations. [9]

(17)   Identification of Specific Individuals or Committees to Whom Information Must

be Reported.  The DIOG specifically identifies individual offices or officers to whom

information must be reported.  As with identifying forms and databases that contain particular

information, disclosing who, specifically, learns certain investigative information presents an

opportunity for counterintelligence exploitation, but it is otherwise a matter of internal procedure

in which there is no interest to the general public.[10]

(18)   Specific Scenarios in Which Particular Activities or Techniques are Authorized.

The DIOG contains a number of concrete hypothetical examples that describe when

particular activities (such as an assessment) or particular investigative techniques may be

used.  The scenarios used in the DIOG are based upon facts and situations that an agent or

---

[9] Redactions of this type have been taken at DIOG-50 (all redactions), 51 (first redaction), 52 (first redaction), 57 (all redactions), 58 (all redactions), 59 (last two redactions), 60 (first two redactions), 61 (all redactions), 62 (all redactions), 63 (last redaction), 64 (all redactions), 65 (first and last redactions), 66 (all redactions), 67 (last redaction), 71 (last redaction), 73 (last redaction), 80 (all redactions), 82 (all redactions), 83 (second and third redactions), 84 (second redaction), 85 (all redactions), 86 (all redactions), 90 (all redactions), 101 (all redactions), 107 (second redaction), 109 (all redactions), 110 (all redactions), 112 (all redactions), 121 (all redactions), 122 (first redaction), 150 (fourth and fifth redactions), 176 (all redactions), 193 (first and second redactions), 197 (all redactions), 207 (last four redactions), 208 (first six redactions), 221 (last three redactions), 222 (first five redactions), 228 (all redactions), 234 (all redactions), 235 (last four redactions), 248 (last redaction), 250 (second paragraph), and 363 (third redaction).

[10] Redactions of this type appear at DIOG 122 (second redaction), 195 (first and third redactions), 207 (second redaction), 208 (seventh, eighth and ninth redactions), 209 (first through fourth redactions), 222 (six through ninth redactions), 223 (all redactions), 364 (second redaction).

analyst may realistically encounter in the performance of their duties. The scenarios were

purposefully drafted this way to provide an effective training and guidance mechanism for the

agents and analysts who must rely on the DIOG to perform their duties. Release of such

information presents an increased risk of potential circumvention. If an individual considering

engaging in illegal activity were aware of specific activities that would or would not trigger

authority for particular investigative activities or techniques, he or she could alter his or her

behavior to avoid detection. In addition, knowing that particular activity would not trigger

authority for a particular investigative activity or technique may embolden a potential lawbreaker

to proceed with his or her plans.[11]

(19)    Scope of Sensitive Investigative Matters. The DIOG identifies certain sensitive

investigative matters for which additional notifications and authorizations are required. *See, e.g*,

DIOG-68. Which procedures are subject to such heightened authorization requirements is a

matter of internal FBI rules and procedures. While the FBI has attempted to disclose as much

information as possible about what it considers to be sensitive investigative matters, it has

determined that the release of more would risk circumvention of law or the FBI's enforcement

efforts. In assessing whether or not to engage in criminal activity, some criminals may weigh the

risk of detection against the rewards for engaging in the behavior. Knowing that some matters

_____

[11] Redactions of this type have been taken at DIOG-51 (second redaction), 52 (all three
redactions), 53 (all redactions), 54 (all redactions), 58 (all redactions), 59 (first redaction), 60 (third
redaction), 61 (first redaction), 63 (first three redactions), 65 (second, third and fourth redactions), 77
(third, fourth, fifth and sixth redactions), 78 (all redactions), 79 (all redactions), 83 (second and third
redactions), 84 (first two redactions), 89 (all redactions), 98 (all redactions), 99 (all redactions), 107 (first
redaction) and 110 (all redactions).

are considered sensitive by the FBI may lead an individual to conclude that because the

investigative technique or activity  necessary to detect the activity is administratively more

burdensome for the FBI to conduct, the FBI is less likely to actually conduct the investigation.  A

person reaching this conclusion may be more likely to engage in the prohibited activity.[12]

(20)    Terms and Definitions.  Related to the redaction of information concerning the

scope of sensitive investigations, the FBI has redacted the definitions of the following types of

subjects of sensitive investigations or other investigations that lead to heightened approval

standards: "political organization or individual prominent in such organization," "religious

organization," "member of the media or news organization," and "academic nexus."  Any

investigation of an organization or person falling within these definitions receives heightened

scrutiny and special treatment as compared to other non-sensitive investigations or investigations

lacking an academic nexus.  Therefore, it would be in the best interests of a front organization or

an intelligence operative to tailor its/their activities to meet the definitional requirements and

thereby possibly evade, elude or circumvent investigation by inviting heightened scrutiny to any

such investigation.  By fitting themselves into the definition and calling attention to their status,

the organization/operative can wrap themselves in the cloak of activities given preferred status by

law and essentially challenge the FBI to investigate knowing that any investigative action would

---

[12] Redactions of this nature have been taken at DIOG-68 (all redactions), 75 (first redaction), 94 (all redactions), 103 (all redactions), 104 (all redactions), 116 (all redactions), 119 (all redactions), 120 (all redactions), 247 (fourth, fifth, sixth, seventh and eighth redactions), and 248 (first eight redactions).

be subject to internal and external examination. It must be emphasized that unlike the definitions of "domestic public official" and "political candidate," which were released in the public version, these definitions are unique and FBI-specific, not found in a dictionary and not necessarily given a definition that would be intuitively obvious.[13]

(21)   Approval Limitations on Techniques or Procedures that May be Used In Certain Types of Investigation. The DIOG collects in one place descriptions of many investigative activities. Whether a particular investigative activity may be undertaken in connection with an assessment, a predicated investigation or so forth is a matter of internal procedure. Likewise, where approval is required for a particular investigative technique, the necessary conditions for approval are matters internal to the FBI. Disclosure of this information, however, could increase the risk of circumvention. A person either considering committing a crime or attempting to evade detection, knowing that certain investigative activities are or are not prohibited during certain types of investigation, can combine this knowledge with other information to improve his ability determine whether his activities are likely to be detected. Similarly, knowledge that a particular activity will not be approved absent certain types of information could be exploited by someone seeking to evade detection.[14]

[13] This information is redacted at DIOG- 68 (first two redactions), 94 (first two redactions), 103 (all redactions), 119 (all redactions), 120 (first two redactions), 254 (last three redactions) 255 (all redactions), 256 (first eight redactions), 257 (first three redactions).

[14] Information of this sort has been redacted at DIOG-69 (all redactions), 72 (all redactions), 75 (all redactions), 76 (all redactions), 77 (all redactions), 78 (all redactions), 79 (all redactions), 81 (all redactions), 83 (all redactions), 84 (all redactions), 96 (all redactions), 127 (first and third redactions), 128 (all redactions), 129 (all redactions), 131 (second redaction), 141 (first two redactions), 145 (first redaction), 147 (second redaction), 151 (all redactions), 152 (all redactions), 201 (all redactions), 226 (all

(22)   <u>Technical or Practical Limitations on Particular Investigative Techniques.</u>  The

DIOG includes descriptions of dozens of investigative techniques employed by the FBI.  Many of

those investigative techniques have practical limitations (for example, those imposed by the

limits of cooperation with other entities) or technical limitations (for example, data that can or

cannot be retrieved).  These limitations are not generally known but would obviously be of

genuine interest to anyone seeking to evade the FBI's efforts to enforce the law.[15]

(23)   <u>Policies on Cooperation with State, Local, Tribal and Foreign Law Enforcement</u>

<u>Agencies</u>.  The DIOG also establishes policy regarding FBI assistance to state, local and tribal

agencies' law enforcement efforts.  Information about when and to what extent the FBI can

involve itself in state, local and tribal investigations would be useful to an individual or entity

attempting to avoid federal scrutiny because of fears that federal scrutiny would prompt more

aggressive enforcement efforts.  Accordingly, the portions of the DIOG concerning these

limitations have been redacted.[16]

(24)   <u>Limitations on Certain Domestic Investigative Activities with Foreign Impact.</u>

_____

redactions),  248 (all redactions), 256 (ninth redaction), 257 (all redactions), 258 (all redactions), 259 (all redactions), 364 (first redaction), 366 (second redaction), 368 (first redaction).

[15] Redactions of this type of material have been taken at DIOG-130 (all redactions), 164 (second redaction), 165 (first two redactions), 167 (all redactions), 180 (all redactions), 182 (all redactions), 183 (all redactions), 184 (all redactions), 185 (second and third redactions), 186 (first redaction), 188 (all redactions), 189 (third redaction), 198 (first redaction), 200 (fifth redaction).

[16] These redactions appear at DIOG-232 (all redactions), 233 (all redactions), 236 (all redactions) and 237 (all redactions).  Similar information regarding foreign law enforcement is redacted at DIOG-234 (all redactions).

Portions of the DIOG describe instances in which domestic investigative activities may have an impact in foreign nations despite the activities being initiated domestically. These activities are subject to special restrictions and approvals. At DIOG-238, the FBI has redacted a number of specific investigative activities that fall under this rubric. Disclosure of the conditions under which additional approvals are required to use certain techniques could assist a potential criminal in determining whether certain activities are likely to garner scrutiny because of the relative difficulty of gaining approval for the use of particular techniques designed to detect the activities. As the FBI necessarily relies on cooperation with its foreign partners more and more since 9/11, the sensitivity of public exposure of these matters becomes more and more risky.

(25)   Undisclosed Participation. The DIOG contains a collection of procedures governing the FBI's undisclosed participation in the activities of third parties. The effectiveness of these techniques is directly contingent upon the FBI keeping its identity undisclosed. The FBI has redacted provisions in the DIOG which describe the circumstances under which FBI personnel and confidential sources may or may not engage in undisclosed participation and the extent if participation is permitted. Were an individual or entity engaged in a criminal activity to know these rules, that knowledge could be used to devise "tests" to detect FBI participation. Not only would this undermine the effectiveness of the technique, but it could also place FBI agents or sources in physical jeopardy. Moreover, providing information about the conditions under which these activities are allowed would allow potential criminals or national security threats to tailor their activities to evade detection. In my years of experience as an agent and a supervisor of agents working with informants and undercover operations, I learned how absolutely critical it

-17-

is to take every precaution to protect identities as well as procedural rules on the use of undisclosed participants. It is not an overstatement to say that lives are at stake. The need to protect these sources and methods is paramount. Accordingly, the FBI has redacted pages of the DIOG covering these activities at DIOG-253-266.

(26)   Duration of Particular Techniques. The DIOG, at various points, describes the time limitations imposed on the use of various investigative techniques. While these internal guidelines are of no interest to the general public, they are of potential interest to persons seeking to evade detection or prosecution for criminal activity. A person learning that a particular technique has been applied in an investigation would be able to combine this information with details from the DIOG to ascertain how long to delay engaging in a criminal activity in order to avoid detection.[17]

(27)   Surveillance and Monitoring Information. Exemption (b)(2) has been asserted in conjunction with (b)(7)(E) to withhold information which could reveal the use of various investigative techniques. The release of this information would disclose the identity and types of devices or methods used in surveillance and monitoring. Such disclosures would enable subjects of FBI investigations to circumvent similar, currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This, in turn, would facilitate the accumulation of information by investigative subjects regarding the

---

[17] The FBI has redacted descriptions on the time limits of various techniques at DIOG-71, 138 (eighth redaction), 143 (third redaction), 145 (fourth redaction), 150 (first redaction), 171 (second redaction) and 210-211.

circumstances under which the specific techniques can be used or requested and the usefulness of

the information obtained. Release of this type of information would enable criminals, terrorists

and spies to educate themselves about the techniques employed for surveillance and monitoring

and therefore allow these individuals to take countermeasures to circumvent the effectiveness of

these techniques and to continue to violate the law. Accordingly, the FBI properly withheld this

information pursuant to FOIA Exemption (b)(2).[18]

(28)  Identification of Obscure Capacities or Investigation Techniques. The entire

DIOG constitutes a set of internal procedures and guidelines for the application of investigative

techniques to specific situations. In the course of describing these guidelines, the DIOG

references certain technologies, investigative capacities and techniques that are not widely

known. Knowledge of the existence of these technologies, capacities or techniques could aid

criminals, terrorists and spies aiming to avoid detection. Accordingly, the FBI properly withheld

this information pursuant to FOIA Exemption (b)(2).[19]

(29)  Internal Web and E-mail Addresses and Phone Numbers. The DIOG contains

internal web addresses where particular information pertaining to the DIOG can be located on the

FBI's Intranet (secure) system, as well as internal e-mail addresses and telephone numbers used

---

[18] Material of this nature has been redacted at DIOG-70 (first redaction), 71 (all redactions) , 72
(all redactions), 135-139 (all redactions), 141-143 (all redactions), 175 (last redaction), 176 (first
redaction), 193 (first two redactions), 195 (first and last redaction), 196 (all redactions) 197-204 (all
redactions), 207 (last four redactions), 208-211 (all redactions), 221 (last four redactions), 222-223 (all
redactions), 226 (all redactions), 363 (second redaction).

[19] Material describing or identifying these techniques is redacted at DIOG-71 (second redaction),
131 (first redaction), 141 (third and fourth redaction), 142 (all redactions), 143 (first, second and eighth
redactions), 144 (second redaction) and 372 (all redactions).

for the purposes of investigative matters. Internal e-mails and web site addresses clearly relate to

the internal practices of the FBI in that they are utilized by FBI personnel during the performance

of their jobs. Disclosure of this type of contact information could subject these individuals to

hackers and unauthorized users, who could disrupt official business (including by impeding the

ability of Special Agents to conduct and conclude law enforcement investigations in a timely

manner). Routine internal administrative information such as the addresses referenced above

serve no public benefit, and there is no indication that there is a genuine public interest in the

disclosure of these numbers. Accordingly, because these internal computer addresses are related

to the FBI's internal practices, because disclosure would not serve any public interest, and

because disclosure could impede the FBI's effectiveness, the FBI properly withheld this

information pursuant to Exemption (b)(2).[20]

### <u>(b)(7)(E)</u>      <u>Investigative Techniques and Procedures</u>

(30)   In addition to Exemption (b)(2), the FBI asserts Exemption (b)(7)(E) with respect

to some redacted portions for reasons similar to those described above to protect information

consisting of specific internal investigatory techniques and procedures that are used by the FBI.

Exemption (b)(7)(E) protects law enforcement procedures and techniques from disclosure. This

exemption also protects guidelines for law enforcement investigations and prosecutions if release

could reasonably be expected to give anyone with that particular knowledge the ability to

---

[20] Material of this nature has been redacted at DIOG-191 (third and fourth redaction), 193 (third redaction), 195 (second redaction), 205 (all redactions), 207 (first redaction), 221 (first redaction), 378 and 383.

circumvent the law. Describing this information in further detail on the public record would disclose the very information which the FBI seeks to protect pursuant to this exemption. The revelation of these details could enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use this important national security law enforcement technique. Accordingly, the FBI has properly withheld this information pursuant to Exemption (b)(7)(E).[21]

### Justification of Specific Redactions of Investigative Techniques and Procedures

(31)   What follows are descriptions of the rationales for the specific redactions taken under Exemption (b)(7)(E), with as much information as the FBI can provide about the redacted material without potentially increasing the risk that FBI techniques or procedures will be circumvented or potential lawbreakers will be encouraged to engage in illegal activities. As described in paragraphs (8) and (9), those who pose a threat to our national security are adept at gaining access to public information that is meaningful to them; they are also adept at piecing together and analyzing a mosaic of information. For this reason, the risk posed by public release of all of the DIOG sections addressed below should be viewed as greater than the risk of disclosure of each individual sections--i.e., the cumulative effect.

(32)   Operational Directives. As explained above (¶ 12), the DIOG contains the FBI's

---

[21] Exemption (b)(7)(E) is cited as a basis for withholding information on the following Bates-stamped pages of the DIOG: DIOG-19-20, 28, 50-54, 57-73, 75-86, 89-91, 93-94, 96, 98-99, 101, 103-104, 107, 109-110, 112, 116, 119-122, 127-131, 135-139, 141-145, 147, 150-152, 155, 157, 163-165, 167-168, 170-177, 180-191, 193, 195-205, 207-213, 221-223, 226, 228, 232-238, 247-248, 250-267, 269, 363-364, 366-369, 372 and 378-383.

Operational Directives describing its policies and procedures, standards, and strategies.

Moreover, releasing the DIOG completely would allow entities and individuals seeking to

commit crimes or threaten the United States' national security an opportunity to assess the

entirety of the FBI's law enforcement and domestic intelligence strategies. Access to such

information would greatly increase the risk that potential lawbreakers would be able to evade

detection and/or be emboldened to engage in criminal activities.[22]

(33)    NSPD-46/HSPD-15/Presidential/Anti-Terrorism Directives. As described in

¶ 13 above, the DIOG contains a description of material contained in an Annex to NSPD-

46/HSPD-15/Presidential/Anti-Terrorism Directives. Release of the redacted information could

risk circumvention of the law in two ways. First, identification of the matters covered by the

_____

[22] Exemption (b)(2) has been asserted to protect Operational Directives on the following
Bates-stamped pages of Exhibit D: DIOG-19-20 (all redactions), 28 (all redactions), 50 (first redaction)
51 (first redaction), 57 (last three redactions), 58 (all redactions), 59 (second redaction), 60 (first two
redactions), 61 (second redaction), 62 (all redactions), 63 (fourth redaction), 64 (all redactions), 65 (first,
third and fourth redactions), 66 (second redaction), 67 (all redactions), 68 (second and third redactions),
70 (first redaction), 73 (all redactions), 75-76 (all), 77 (first two redactions),  80-81 (all redactions), 84
(last two redactions), 85-86 (all redactions), 90-91 (all redactions), 93 (all redactions), 94 (last three
redactions), 96 (all redactions), 99 (all redactions), 101 (all redactions), 103-104 (all redactions), 107
(second redaction), 109 (all redactions), 112 (all redactions), 116 (all redactions), 120-121 (all
redactions), 122 (first and second redactions), 136-139 (all redactions), 141 (first two redactions), 142
(all redactions), 143 (all redactions), 145 (all redactions), 147 (all redactions), 150-152 (all redactions),
155 (all redactions), 157 (all redactions), 163-165 (all redactions), 167-168 (all redactions), 170-177 (all
redactions), 180 (all redactions), 181 (all redactions), 182 (first redaction), 183 (last two redactions),
184-190 (all redactions), 191 (first, second and fourth redactions) 193 (first three redactions), 195-204
(all redactions), 207 (last five redactions), 208-213 (all redactions), 221 (last four redactions), 222-223
(all redactions), 226 (all redactions), 228 (all redactions), 232-234 (all redactions), 235 (first five
redactions), 236 (last three redactions), 237-238 (all redactions), 247 (all redactions), 248 (first and third
redactions), 250 (all redactions), 253 (all redactions), 254 (first two redactions), 256 (ninth redaction)
257 (last six redactions), 258-262 (all redactions), 267 (all redactions), 269 (all redactions), 379-382 (all
redactions).

Annex will provide potential terrorists with information about the activities governed by the

Annex and, therefore, within the purview of more than one agency. Second, revealing this

general description of the Annex may entice those interested in conducting espionage against the

United States to seek a copy of the NSPD-46/HSPD-15/Presidential/Anti-Terrorism Directives

and its Annexes.[23]

(34)    Unaddressed Work. As explained above (¶ 14), the DIOG contains a description

of procedures with respect to the treatment and storage of unaddressed work; i.e., work that the

FBI has not yet completed. Release of this information would reveal how the FBI deals with

internal resource limitations and also discloses a location where information useful to potential

lawbreakers is maintained. The information would not only present a target for intelligence

exploitation, but a description of the FBI's resource allocation practices could undermine the

FBI's crime deterrence efforts. [24]

(35)    Collection and/or Analysis of Information. As explained in ¶ 15 above, the

DIOG describes numerous methods that the FBI uses to collect and analyze the information that

it obtains for investigative purposes. Since 9/11 and especially after the enactment of the

Intelligence Reform and Terrorist Prevention Act of 2004 (IRTPA), the FBI has been

transforming itself into an intelligence-driven agency to aid its paramount mission of detecting

and preventing harm to the national security before it happens. Two essential components of this

---

[23] These redactions appear at DIOG-19-20.

[24] This redaction appears at DIOG-28.

effort--indeed the sine qua non of this mission--are the collection and analysis of information.

The FBI has fully described this new mandate under IRTPA to the American public--but it has

not disclosed the precise methods by which it will be carried out. The release of this information

would disclose methods used in the collection and analysis of information.  Such disclosures

would enable subjects of FBI investigations to circumvent similar, currently used techniques.

The relative utility of these techniques could be diminished if the actual techniques were released

in this matter.  This, in turn, would facilitate the accumulation of information by investigative

subjects regarding the circumstances under which the specific techniques can be used or

requested and the usefulness of the information obtained.  To release this type of information

would enable criminals, terrorists and spies to educate themselves about the techniques employed

for the collection and analysis of information that information would improve the ability of such

individuals to take countermeasures to circumvent the effectiveness of the techniques and to

continue to violate the law and engage in intelligence, terrorist, and criminal activities.[25]

(36)    Identification and Contents of File Numbers, Identifying Symbols, Forms and

Databases.  As described above (¶ 16), information describing specific filing numbers and

procedures and the information recorded on specific forms and in non-public databases is

----

[25] These redactions appear at DIOG-69 (all redactions), 82 (all redactions), 127-129 (all
redactions), 131 (second redaction), 145 (all redactions), 147 (all redactions), 150 (all redactions), 152
(all redactions), 164 (first three redactions), 165 (all redactions), 167-168 (all redactions), 170-176 (all
redactions), 180 (all redactions), 182 (first redaction), 183 (last two redactions), 184 (all redactions), 185
(last two redactions), 186 (all redactions), 188-190 (all redactions), 191 (first two redactions), 212-213
(all redactions), 248 (first redaction), 252-253 (all redactions), 254 (first two redactions), 256 (ninth
redaction), 257 (last six redactions), 258-262 (all redactions), 267 (all redactions), 269 (all redactions).

detailed throughout the DIOG. If released, this information could be of great interest to

individuals and entities seeking to engage in espionage against the United States by obtaining

secret information about national security and terrorism investigations. An entity seeking to

locate information to illegally exploit would be greatly aided in its efforts by the DIOG's detailed

description of these materials. In addition, if released, this information would identify the types

of information needed to authorize particular investigative techniques. Release of such

information could assist a potential criminal by identifying information to obscure or hide in

order to "cover one's tracks."[26]

(37) Identification of Specific Individuals or Committees to Whom Information Must

be Reported. As explained in ¶ 17, the DIOG identifies individual offices or officers to whom

certain information must be reported. As with identifying forms and the databases that contain

specific information, identifying who, specifically, learns certain investigatory information makes

those individuals targets for intelligence operatives.[27]

---

[26] Redactions of this type have been taken at DIOG-50 (all redactions), 51 (first redaction), 52 (first redaction), 57 (all redactions), 58 (all redactions), 59 (last two redactions), 60 (first two redactions), 61 (all redactions), 62 (all redactions), 63 (last redaction), 64 (all redactions), 65 (first and last redactions), 66 (all redactions), 67 (last redaction), 71 (last redaction), 73 (last redaction), 80 (all redactions), 82 (all redactions), 83 (second and third redactions), 84 (second redaction), 85 (all redactions), 86 (all redactions), 90 (all redactions), 101 (all redactions), 107 (second redaction), 109 (all redactions), 110 (all redactions), 112 (all redactions), 121 (all redactions), 122 (first redaction), 150 (fourth and fifth redactions), 176 (all redactions), 193 (first and second redactions), 197 (all redactions), 207 (last four redactions), 208 (first six redactions), 221 (last three redactions), 222 (first five redactions), 228 (all redactions), 234 (all redactions), 235 (first two redactions), 248 (last redaction), 250 (second paragraph), and 363 (third redaction).

[27] Redactions of this type appear at DIOG 122 (second redaction), 195 (first and third redactions), 207 (second redaction), 208 (seventh, eighth and ninth redactions), 209 (first through fourth redactions), 222 (six through ninth redactions), 223 (all redactions), 364 (second redaction).

(38)    Specific Scenarios in Which Particular Activities or Techniques are Authorized.

As detailed above (¶ 18), the DIOG contains a number of hypothetical examples that illustrate

when particular activities or particular investigative techniques may be used.  Release of such

information presents an increased risk of potential circumvention.  If an individual were

considering engaging in illegal activity, knowledge of specific activities that would or would not

trigger authority to use particular investigative activities or techniques, would improve his or her

ability to alter behavior to avoid detection.  In addition, knowing that a particular activity would

not trigger authority for a particular investigative activity or technique may embolden a potential

lawbreaker to proceed with his or her plans.[28]

(39)    Scope of Sensitive Investigative Matters.  As described in ¶ 19, the DIOG

identifies certain sensitive investigative matters for which additional notifications and

authorizations are required.  *See, e.g*, DIOG-68.  In assessing whether or not to engage in

criminal activity, some criminals may weigh the risk of detection against the rewards for

engaging in the behavior.  Knowing that some matters are considered sensitive by the FBI may

lead an individual to conclude that, because the investigative technique or activity necessary to

detect the activity is administratively more burdensome for the FBI to conduct, the FBI is less

likely to actually conduct the investigation.  A person reaching this conclusion may be more

_____

[28] Redactions of this type have been taken at DIOG-51 (second redaction), 52 (all redactions), 53 (all redactions), 54 (all redactions), 58 (all redactions), 59 (first redaction), 60 (third redaction), 61 (first redaction), 63 (first three redactions), 65 (second, third and fourth redactions), 77 (third, fourth, fifth and sixth redactions), 78 (all redactions), 79 (all redactions), 83 (second and third redactions), 84 (first two redactions), 89 (all redactions), 98 (all redactions), 99 (all redactions), 107 (first redaction) and 110 (all redactions).

likely to engage in the prohibited activity.[29]

(40)    Terms and Definitions.  As explained in ¶ 20 above the FBI has redacted the

definitions of the following types of subjects of sensitive investigations or other investigations

subject to heightened approval standards: "political organization or individual prominent in such

organization," "religious organization," "member of the media or news organization," and

"academic nexus."  Any investigation of an organization or person falling within these

definitions receives heightened scrutiny and special treatment as compared to non-sensitive

investigations or investigations lacking an academic nexus. by inviting heightened scrutiny to

any such investigation.  By fitting themselves into the definition and calling attention to their

status, the organization/operative can wrap themselves in the cloak of activities given preferred

status by law and essentially challenge the FBI to investigate knowing that any investigative

action would be subject to internal and external examination. The public disclosure of the

investigation could prove politically and/or publicly damaging to the best interests of the FBI,

forcing it to spend resources deflecting criticism and having to adjust the techniques and intensity

of the investigation because of potentially- adverse consequences such as bad publicity,

accusations of discrimination and possible political retaliation. Extreme cases might cause an

investigation to be completely abandoned.  It must be emphasized that unlike the definitions of

"domestic public official" and "political candidate," which were released in the public version,

_____

[29] Redactions of this nature have been taken at DIOG-68 (all redactions), 75 (first redaction), 94
(all redactions), 103 (all redactions), 104 (all redactions), 116 (all redactions), 119 (all redactions), 120
(all redactions), 247 (fourth, fifth, sixth, seventh and eighth redactions), and 248 (first eight redactions).

these definitions are unique and FBI -specific, and not necessarily given a definition that would be intuitively obvious.[30]

(41)    Approval Limitations on Techniques or Procedures that May be Used In Certain Types of Investigation. As explained above in ¶ 21, the DIOG constitutes an aggregate collection of descriptions of many investigative activities. Disclosure of this information could increase the risk of circumvention of FBI investigative techniques or of substantive law. A person either considering committing a crime or attempting to evade detection, knowing that certain investigative activities are or are not prohibited during certain types of investigation, can combine this knowledge with other information to determine whether his or her activities are likely to be detected. Similarly, knowledge that a particular activity will not be approved absent certain types of information could be exploited by someone seeking to evade detection.[31]

(42)    Technical or Practical Limitations on Particular Investigative Techniques. As described above in ¶ 22, the DIOG includes descriptions of dozens of investigative techniques employed by the FBI. Many of those investigative techniques have practical limitations (for example, those imposed by the limits of cooperation with other entities) or technical limitations

---

[30] This information is redacted at DIOG- 68 (first two redactions), 94 (first two redactions), 103 (all redactions), 119 (all redactions), 120 (first two redactions), 254 (last three redactions) 255 (all redactions), 256 (first eight redactions), 257 (first three redactions).

[31] Information of this sort has been redacted at DIOG-69 (all redactions), 72 (all redactions), 75 (all redactions), 76 (all redactions), 77 (all redactions), 78 (all redactions), 79 (all redactions), 81 (all redactions), 83 (all redactions), 84 (all redactions), 96 (all redactions), 127 (first and third redactions), 128 (all redactions), 129 (all redactions), 131 (second redaction), 141 (first two redactions), 145 (first redaction), 147 (second redaction), 151 (all redactions), 152 (all redactions), 201 (all redactions), 226 (all redactions), 248 (all redactions), 256 (ninth redaction), 257 (all redactions), 258 (all redactions), 259 (all redactions), 364 (first redaction), 366 (second redaction), 368 (first redaction).

(for example, data that can or cannot be retrieved). These limitations are not generally known but would obviously be of genuine interest to anyone seeking to evade the FBI's efforts to enforce the law.[32]

(43)   <u>Policies on Cooperation with State, Local or Tribal Agencies</u>. As explained above (¶ 23), the DIOG also establishes policy for FBI assistance to state, local, tribal and foreign agencies' law enforcement efforts. Information about when and to what extent the FBI will involve itself in state, local, tribal and foreign investigations would be useful to an individual or entity attempting to avoid federal scrutiny because of fears that federal scrutiny would prompt more aggressive enforcement efforts. Accordingly, the portions of the DIOG concerning these limitations have been redacted.[33]

(44)   <u>Limitations on Certain Domestic Investigative Activities with Foreign Impact</u>. As described in ¶ 24, portions of the DIOG describe instances in which domestic investigative activities may have an impact on foreign nations despite the activities being initiated domestically. At DIOG-238, the FBI has redacted a number of specific investigative activities that fall under this rubric. Information regarding the conditions under which additional approvals

---

[32] Redactions of this type of material have been taken at DIOG-130 (all redactions), 164 (second redaction), 165 (first two redactions), 167 (all redactions), 180 (all redactions), 182 (all redactions), 183 (all redactions), 184 (all redactions), 185 (second and third redactions), 186 (first redaction), 188 (all redactions), 189 (third redaction), 198 (first redaction), 200 (fifth redaction).

[33] These redactions appear at DIOG-232 (all redactions), 233 (all redactions), 236 (all redactions) and 237 (all redactions). Similar information regarding foreign law enforcement is redacted at DIOG-234 (all redactions).

are required could assist a potential criminal in determining that certain activities are unlikely to

garner scrutiny because the relative difficulty of gaining approval for the use of techniques

designed to detect these activities. As the FBI necessarily relies on cooperation with its foreign

partners more and more since 9/11, the sensitivity of public exposure of these matters becomes

more and more risky.

(45)    Undisclosed Participation. As explained in ¶ 25, the DIOG contains a collection

of procedures governing the FBI's undisclosed participation in the activities of third parties.

The effectiveness of these techniques is directly contingent upon the FBI keeping its identity

undisclosed. The FBI has redacted provisions in the DIOG which describe the circumstances

under which FBI personnel and confidential sources may or may not engage in undisclosed

participation and the extent if participation is permitted. Were an individual or entity engaged in

a criminal activity to know these rules, that knowledge could be used to devise "tests" to detect

FBI participation. Not only would this undermine the effectiveness of the technique, but it could

also place FBI agents or sources in physical jeopardy. Moreover, providing information about

the conditions under which these activities are allowed would allow potential criminals or

national security threats to tailor their activities to evade detection. As I stated in ¶ 25, the

necessity for protecting identities as well as sources and methods cannot be overemphasized.

Accordingly, the FBI has redacted pages of the DIOG covering these activities at DIOG-253-266.

(46)    Duration of Particular Techniques. As explained in ¶ 26, the DIOG, at various

points, describes the time limitations imposed on the use of various investigative techniques.

While these internal guidelines are of no interest to the general public, they are of potential

-30-

interest to persons seeking to evade detection or prosecution for criminal activity. A person who learns that a particular technique has been used in an investigation would be able to combine that information with details from the DIOG to ascertain how long to delay engaging in a criminal activity in order to increase the likelihood that he or she will avoid detection.[34]

(47)   <u>Surveillance and Monitoring Information</u>. As explained in ¶ 27, the FBI has redacted information that would reveal the identity and types of devices or methods used in surveillance and monitoring.   Such disclosures would enable subjects of FBI investigations to circumvent similar, currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This, in turn, would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques can be used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals, terrorists and spies to educate themselves about the techniques employed for surveillance and monitoring and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law.[35]

(48)   <u>Identification of Obscure Capacities or Investigation Techniques</u>. As previously

---

[34] The FBI has redacted descriptions on the time limits of various techniques at DIOG-71, 138 (eighth redaction), 143 (third redaction), 145 (fourth redaction), 150 (first redaction), 171 (second redaction) and 210-211.

[35] Material of this nature has been redacted at DIOG-70 (first redaction), 71 (all redactions), 72 (all redactions), 135-139 (all redactions), 141-143 (all redactions), 175 (last redaction), 176 (first redaction), 193 (first two redactions), 195 (first and last redaction), 196 (all redactions) 197-204 (all redactions), 207 (last four redactions), 208-211 (all redactions), 221 (last four redactions), 222-223 (all redactions), 226 (all redactions), 363 (second redaction).

explained (¶ 28), the DIOG references certain technologies, investigative capacities and techniques that are not widely known. Knowledge of the existence of these technologies, capacities or techniques could aid those criminals who are aiming to avoid detection.[36]

(49)   Internal Web and E-mail Addresses and Phone Numbers.  As previously noted in ¶ 29, the DIOG contains internal web addresses where particular information pertaining to the DIOG can be located, as well as internal e-mail addresses and phone numbers used for the purposes of investigative matters. Revealing this type of contact information could subject these individuals to hackers and unauthorized users which could disrupt official business, including by impeding the ability of Special Agents to conduct and conclude law enforcement investigations in a timely manner. [37]

## CONCLUSION

(50)   For the forgoing reasons, I respectfully submit that no further information from the DIOG regarding its rules, policies, procedures and guidelines for conducting investigations should be released into the public sphere.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

---

[36] Material describing or identifying these techniques is redacted at DIOG-71 (second redaction), 131 (first redaction), 141 (third and fourth redaction), 142 (all redactions), 143 (first, second and eighth redactions), 144 (second redaction) and 372 (all redactions).

[37] Material of this nature has been redacted at DIOG-191 (third and fourth redaction), 193 (third redaction), 195 (second redaction), 205 (all redactions), 207 (first redaction), 221 (first redaction), 378 and 383.

Executed this __13ᵗʰ__ day of November, 2009.

JOHN S. PISTOLE
DEPUTY DIRECTOR
Federal Bureau of Investigation
Washington, D.C.